# Exhibit 2

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
CALENDAR: N
PAGE 1 of 34
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| Elliott Associates, L.P.; Elliott International, L.P.; The Liverpool Partnership; Tyrus Capital Event Master Fund Limited; and Tyrus Capital Opportunities Master Fund Limited, | Case No.: |
| Plaintiffs, | Judge: |
| -v- | JURY TRIAL DEMANDED |
| AbbVie Inc., | |
| Defendant. | |

## COMPLAINT

1.      This is a lawsuit for fraud committed by AbbVie Inc., an Illinois-based pharmaceutical company, in connection with its aborted 2014 agreement to acquire Shire plc, an Ireland-based pharmaceutical company. Plaintiffs are hedge funds that were induced by AbbVie's fraud to acquire interests in Shire shares and suffered substantial damages as a result.

2.      On June 25, 2014, AbbVie promoted its proposed acquisition of Shire as a "strategically compelling" merger that "would create a larger and more diversified biopharmaceutical company with multiple leading franchises and significant financial capacity for future acquisitions, investment and enhanced shareholder distributions and value creation." AbbVie emphasized that acquiring Shire would significantly diversify AbbVie's product line, which was overwhelmingly reliant on a single drug (Humira®) for which the U.S. patent is set to expire this year, and that the improved product mix offered the potential for substantially increasing AbbVie's share price.

3.      As part of the Shire acquisition, AbbVie would reincorporate outside the United States through a "tax inversion," a controversial tax-reduction device then the subject of proposed governmental restrictions and intense political debate.  As an illustration, in March 2014, President Obama issued a proposed federal budget that included significant restrictions on tax inversions.  Further, in May 2014 – one month before AbbVie's announcement of the proposed Shire acquisition – then-U.S. Senator Carl Levin and Representative Sander Levin proposed the Stop Corporate Inversions Act of 2014, which would impose a two-year moratorium on corporate inversions used to avoid U.S. taxes.

4.      Against this backdrop of political debate and controversy over tax inversions, on July 18, 2014, AbbVie and Shire announced agreed terms of a combination involving a tax inversion.  In response to questions about the risk of governmental restrictions on inversions, AbbVie assured investors that tax benefits were "not the primary rationale" for the Shire deal, and represented that it had "studied this transaction very, very carefully" and had concluded that the deal was "highly executable" despite the potential for government action.  AbbVie again emphasized the "excellent strategic fit" between it and Shire and the "compelling financial impact well beyond the tax impact."  Consistent with AbbVie's representations downplaying the importance of tax-inversion considerations, the agreed terms of the combination expressly carved out potential governmental action to restrict tax inversions from the conditions to closing the Shire deal.

5.      But as its subsequent actions revealed, AbbVie's statements that the Shire transaction was strategically and financially compelling beyond the tax impact, and that it had studied the transaction "very, very carefully" and had concluded it was "highly executable" despite the risk of government action against inversions, were false and misleading, on

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 2 of 34

information and belief as described below. In making these statements about its rationale for the deal, AbbVie also concealed a material fact concerning its Board's support for the Shire transaction, on information and belief as described below: AbbVie did not disclose that its Board had not conducted an evaluation as to whether it would close the transaction in the event the government took action that eliminated or reduced the tax-inversion benefits of the deal. On information and belief as described below, AbbVie knew that Shire investors (such as Plaintiffs) would be highly reluctant to support the transaction if they knew that AbbVie had not studied whether it would close the transaction in the event the government took such action – especially in light of the controversy surrounding tax inversions and the wide expectation that the government might take such action. AbbVie's misrepresentations and concealment induced Plaintiffs to acquire interests and hold substantial positions in Shire shares in support of AbbVie's acquisition plan.

6.      Investors' expectations about potential government action against inversions proved well founded. On September 22, 2014, before completion of AbbVie's acquisition of Shire, the U.S. Department of the Treasury announced new regulations limiting certain aspects of tax inversions. But the new regulations were relatively modest. Unlike certain proposals issued just weeks prior to AbbVie announcing its acquisition of Shire, these new regulations did not bar tax inversions, and would only partially reduce the tax benefits of AbbVie's acquisition of Shire. A week later, on September 29, 2014, AbbVie's Chairman and Chief Executive Officer Richard Gonzalez publicly emphasized AbbVie's continuing commitment to the Shire transaction, stating that he was "more energized than ever" and was "more confident than ever" about the AbbVie-Shire combination. Mr. Gonzalez gave no indication in his statements that AbbVie believed the deal was no longer "highly executable." By Mr. Gonzalez's statements a full week after the

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 3 of 34

3

announcement of the new tax-inversion regulations, AbbVie induced Plaintiffs to maintain their Shire positions and to make additional acquisitions of interests in Shire shares.

7. Yet, two weeks later, in mid-October 2014, AbbVie's Board suddenly abandoned the Shire acquisition. In publicly rationalizing the Board's reversal of its support for the transaction, AbbVie pointed only to the loss of some tax-inversion benefits that would result from the new regulations. AbbVie claimed the relatively modest regulations announced in September "destroyed the value of this transaction." AbbVie's actions revealed that, contrary to its numerous representations, it did not, in fact, consider the Shire acquisition as providing compelling financial and strategic benefits beyond tax savings, particularly because the announced changes were relatively modest. AbbVie's actions and statements after the September 2014 announcement demonstrated that as of July 18, 2014 AbbVie had not conducted an evaluation as to whether it would close the transaction in the event the government took action that eliminated or reduced the tax-inversion benefits of the deal.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 4 of 34

### Parties, Jurisdiction, and Venue

8. AbbVie, Inc. is a Delaware-incorporated pharmaceutical company with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie's principal business is the discovery, development, manufacture, and sale of pharmaceutical products. AbbVie is a 2013 spin-off of another Illinois-based corporation, Abbott Laboratories. AbbVie's common stock trades under the ticker symbol "ABBV" on the New York Stock Exchange and the Chicago Stock Exchange. On information and belief, AbbVie executives operating from AbbVie's principal executive offices in suburban Chicago directed AbbVie's conduct at issue in this Complaint.

4

9.      Plaintiff Elliott Associates, L.P. is a Delaware limited partnership with its principal address at 40 West 57th Street, 4th Floor, New York, New York 10019.

10.      Plaintiff Elliott International, L.P. is a Cayman Islands limited partnership with its registered address c/o Maples & Calder, P.O. Box 309, Ugland House, South Church Street, George Town, Cayman Islands.

11.      Plaintiff The Liverpool Partnership is a Bermuda limited partnership with its registered address at Canon's Court, 22 Victoria Street, Hamilton HM12, Bermuda.  This Complaint refers to Elliott Associates, L.P., Elliott International, L.P., and The Liverpool Partnership collectively as the "Elliott Plaintiffs."

12.      Plaintiff Tyrus Capital Event Master Fund Limited is an exempted company incorporated under the laws of the Cayman Islands, having its registered office at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands.

13.      Plaintiff Tyrus Capital Opportunities Master Fund Limited is an exempted company incorporated under the laws of the Cayman Islands, having its registered office at P.O. Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands.  This Complaint refers to Tyrus Capital Event Master Fund Limited and Tyrus Capital Opportunities Master Fund Limited collectively as the "Tyrus Plaintiffs."

14.      This Court has personal jurisdiction over AbbVie because AbbVie is a corporation with its principal place of business in Illinois and therefore is a citizen of Illinois.

15.      Venue is proper in this Court because AbbVie is authorized to transact business in Illinois and maintains its registered office in Cook County, Illinois c/o its registered agent CT Corporation System, 208 South LaSalle Street, Chicago, Illinois 60604.  Venue is also proper in

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 5 of 34

this Court because AbbVie is authorized to transact business in Illinois and is doing business in Cook County, Illinois.

16.     Shire, which is not a party to this action, is a Jersey-registered, Irish-headquartered global pharmaceutical company that has over 3,000 employees in the United States.  Shire's shares trade on the London Stock Exchange and, in the form of American Depositary Shares, in the United States on the NASDAQ.

## AbbVie's Preparations, Negotiations, and Agreement to Acquire Shire

17.     In October 2013, AbbVie senior management discussed internally the possibility of engaging in a strategic transaction with Shire, and representatives from J.P. Morgan provided AbbVie with a review of Shire.  Over the following six months, AbbVie senior management continued to consider internally the possibility of engaging in a significant strategic transaction with Shire.

18.     On April 30, 2014, the AbbVie Board convened a special meeting at which AbbVie senior management reviewed with the AbbVie Board legal, financial, and other considerations in connection with a potential transaction with Shire.  The AbbVie Board authorized AbbVie senior management to contact Shire and make a non-binding, preliminary proposal regarding a potential strategic transaction.  Between May 2014 and mid-June 2014, AbbVie approached Shire several times about the possibility of AbbVie's acquisition of Shire.

19.     On June 19, 2014, in response to press rumors of a potential acquisition of Shire by AbbVie, the UK Takeover Panel required AbbVie to issue an announcement pursuant to Rule 2.4 of the UK Takeover Code noting the recent press speculation and confirming it had made three indicative, non-binding proposals to Shire, all of which had been rejected by the Shire Board.  AbbVie issued such a statement on June 20, 2014, which is attached as Exhibit 1 to this Complaint.  That same day, after AbbVie's disclosure, Shire's shares closed up nearly 17%.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 6 of 34

20.     On June 25, 2014, AbbVie released a detailed announcement regarding its non-binding offer (Exhibit 2 to this Complaint) and a presentation detailing the merits of AbbVie's proposed acquisition of Shire (Exhibit 3 to this Complaint). On the same day, AbbVie held a conference call with investors and analysts detailing the advantages of a combination of AbbVie and Shire. In the days following that conference call, AbbVie engaged in a series of conversations with institutional AbbVie stockholders and institutional Shire shareholders regarding the merits of a combination. On June 25, 2014, Shire's shares closed up 2.57% from the prior day, and up more than 20% since the day before AbbVie's initial June 20, 2014 announcement.

21.     On July 13, 2014, AbbVie made a non-binding acquisition proposal to Shire that had an indicative value of £53.20 per Shire Ordinary Share, comprised of £24.44 in cash and 0.8960 shares of the proposed combined AbbVie-Shire entity (the "Final Proposal") (based on AbbVie's closing share price of $54.96 and an exchange rate of $1.00:£0.5840 on July 11, 2014).

22.     On July 14, 2014, Shire released an announcement stating that it had requested and received the Final Proposal, and that the Shire Board had indicated to AbbVie that it would be willing to recommend an offer at the price level of the Final Proposal to Shire shareholders subject to satisfactory resolution of the other terms of the offer.

23.     From the morning of July 15, 2014 through the early morning of July 18, 2014, representatives from AbbVie, J.P. Morgan, and AbbVie's UK and U.S. legal advisors met with representatives of Shire, Shire's financial advisors, and Shire's UK and U.S. legal advisors in New York City. In those meetings, the participants discussed due diligence and negotiated the terms of a potential recommended transaction. The negotiations centered around the conditions to the transaction, the process and timing of obtaining antitrust and competition clearances, and

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 7 of 34

7

whether a break fee or other compensation payment would apply if the transaction were not to be completed under various scenarios, including the AbbVie Board changing its recommendation or the AbbVie stockholders failing to approve the transaction.

24.     On July 17, 2014, the AbbVie Board held a special meeting to consider the proposed transaction. At the meeting, AbbVie senior management, together with its legal and financial advisors, described to the AbbVie Board the proposed terms of the combination, the financing of the combination, and the draft transaction agreements. Representatives of J.P. Morgan reviewed the financial terms and provided a financial analysis of the proposed transaction. J.P. Morgan rendered an opinion to the AbbVie Board that, as of that date and based upon and subject to the factors and assumptions set forth in its opinion, the exchange ratio of one share of the new combined AbbVie-Shire entity for each outstanding AbbVie share in the transaction was fair, from a financial point of view, to the AbbVie stockholders.

25.     After considering the proposed terms of the transaction and the various presentations of its legal and financial advisors, the AbbVie Board resolved that the transaction to acquire Shire was in the best interest of AbbVie stockholders and approved the transaction. The Board recommended adoption of a merger agreement by AbbVie stockholders, authorized AbbVie to enter into the merger agreement and other documents related to the transaction, and authorized specified officers to negotiate, execute, and deliver documents on behalf of AbbVie in connection with the transaction, and to cause subsidiaries to do the same and to take actions necessary or advisable to consummate the acquisition of Shire.

26.     On the morning of July 18, 2014, AbbVie and Shire executed a Co-operation Agreement and a Merger Agreement, and AbbVie and Shire jointly issued an announcement

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 8 of 34

pursuant to Rule 2.7 of the UK Takeover Code that the AbbVie Board and the Shire Board had

reached an agreement on the terms of a recommended combination of AbbVie and Shire.

27.     AbbVie announced that shares of the merged company – to remain known as

AbbVie – would be listed on both the New York Stock Exchange and the Chicago Stock

Exchange after the deal closed.  AbbVie would be incorporated in Jersey, Shire's place of

incorporation, and remain headquartered in North Chicago.

28.     In the announcement of the agreed terms of the acquisition, AbbVie disclosed

certain conditions, the failure of any of which would allow AbbVie to terminate the acquisition.

The achievability of tax-inversion benefits was not one of those conditions.  To the contrary, and

in contrast to another prominent contemporaneous merger agreement between two other large

health care companies (Medtronic and Covidien) that had expressly conditioned the closing of

their merger on the availability of tax-inversion benefits, AbbVie and Shire expressly carved out

from the conditions to closing any legal and regulatory changes aimed at tax inversions that

could eliminate AbbVie's ability to move its tax domicile outside of the United States.  This

underscored for Shire investors that closing the Shire transaction did not depend on the absence

of government restrictions on tax inversions.

29.     Shire's shares rose to £49.96 on July 18, 2014, up more than 33% since the day

before AbbVie's initial announcement on June 20, 2014.

**AbbVie Publicly Explains Its Compelling Strategic Rationale**
**For the Shire Acquisition and AbbVie's Commitment to Close the Deal**

30.     In its June 25, 2014 press release announcing its proposal to acquire Shire,

AbbVie stated:

> The proposed combination is strategically compelling to AbbVie
> and Shire and would create a larger and more diversified
> biopharmaceutical company with multiple leading franchises and

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 9 of 34

significant financial capacity for future acquisitions, investment and enhanced shareholder distributions and value creation[.]

AbbVie is offering Shire shareholders compelling immediate value with significant future upside potential from ownership in New AbbVie that AbbVie expects will create long-term value for all shareholders[.]

(Exhibit 2.)

31. Also on June 25, 2014, AbbVie publicly released a letter to AbbVie employees from AbbVie's Chairman and CEO Mr. Gonzalez (Exhibit 4 to this Complaint). In his letter, Mr. Gonzalez provided a lengthy list of strategic benefits from the "strong and compelling combination" of AbbVie with Shire:

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 10 of 34

AbbVie and Shire together represent a strong and compelling combination, creating a larger and more diversified platform with significant financial capacity for future acquisitions, investment, enhanced shareholder distributions and value creation. The new company would have multiple leadership positions in immunology, rare diseases, virology, neuroscience, metabolic disease and emerging oncology.

The combination would result in accelerated growth for both companies by leveraging AbbVie's broad geographic footprint. We would utilize our commercial, regulatory, medical affairs and market access infrastructure to more rapidly and more cost effectively expand Shire's rare disease and neuroscience franchises. Additionally, we would have a broader and deeper pipeline, with more than 15 programs in Phase Three development or under regulatory review.

32. The "larger and more diversified platform" and "broader and deeper pipeline" that would result from combining AbbVie with Shire would address AbbVie's heavy dependence on a single drug, Humira®, which accounted for more than 50% of AbbVie's 2013 revenues and is scheduled to lose U.S. patent protection this year. AbbVie's lack of diversification had caused its common stock to trade at a discount to its better-diversified peers. AbbVie explained in a separate press release that day that diversification of AbbVie's product mix, a key benefit to the

Shire combination, presented the "[p]otential for New AbbVie [the combined entity] share price appreciation and potential re-rating" with a higher valuation multiple. (Exhibit 2 at 4.)

33.     Under the terms of the Shire acquisition agreement announced on July 18, 2014, AbbVie would reincorporate in Jersey (where Shire is incorporated), thereby effecting a "tax inversion," a procedure by which a U.S. corporation reincorporates as a foreign corporation in order to reduce U.S. taxes. Generally, the U.S. government taxes corporate profits of U.S. companies wherever earned, and at a rate that is higher than in many other developed countries. However, the U.S. taxes only the U.S. profits of foreign companies. When a company transforms from a U.S. company to a foreign company through a merger, or "inverts," it will no longer owe U.S. tax on its profits earned outside the U.S. (though it still will owe U.S. tax on its U.S. profits). The ability to avoid U.S. taxation of foreign profits creates an incentive for U.S. companies with large foreign markets to take on the tax status of an acquired foreign company.

34.     When AbbVie announced its proposed acquisition of Shire, tax inversions had become the subject of intense political controversy and at risk of governmental action to eliminate or reduce tax-inversion benefits. In the first quarter of 2014, President Obama issued an annual federal budget proposal that included significant restrictions on tax inversions, which he criticized for "facilitat[ing] the erosion of the U.S. tax base." Shortly thereafter, then-Senator Carl Levin and Representative Sander Levin proposed the Stop Corporate Inversions Act of 2014 to Congress. On July 15, 2014, U.S. Treasury Secretary Jacob Lew sent a letter to Congress urging lawmakers to enact legislation – and to make it retroactive to May 2014 – to end tax inversions. That same week, the U.S. Senate Appropriations Committee passed a spending bill barring federal defense contracting with companies that had implemented a tax inversion. A week later, the U.S. Senate Finance Committee held a widely publicized hearing on tax

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 11 of 34

11

inversions, during which the committee chairman Ron Wyden and Senator Charles Schumer called for legislation restricting tax inversions.

35.     On July 18, 2014, when AbbVie announced the agreed terms of its acquisition of Shire, AbbVie disclosed various terms of its agreements with Shire that demonstrated AbbVie's strong commitment to close the transaction, including:

    a.     a break fee provision that would require AbbVie to pay Shire $1.635 billion in cash if AbbVie terminated the deal in certain circumstances; and

    b.     closing conditions that did not include – and expressly carved out – achievability of tax-inversion benefits.

36.     Also on July 18, 2014, after AbbVie announced its agreement with Shire on acquisition terms, AbbVie CEO Mr. Gonzalez and AbbVie Chief Financial Officer Bill Chase conducted an investor conference call to discuss the deal.  According to statements made during the call, Mr. Gonzalez and Mr. Chase conducted this conference call from AbbVie's North Chicago offices.

37.     On the July 18, 2014 conference call, investment analysts specifically asked AbbVie to address whether – in light of the substantial negative publicity and controversy surrounding tax inversions at the time and the risk of government action to eliminate or restrict tax-inversion benefits – tax-inversion considerations were critical to AbbVie's rationale for acquiring Shire.  J.P. Morgan investment analyst Chris Schott asked, "there has been a lot of noise coming out of Washington recently on the topic of inversion.  Can you just talk a little bit about how you thought about that risk as you considered the Shire deal and potentially re-domiciling the Company into the UK?"  Mr. Gonzalez responded:

        Okay, maybe let me chat a little bit about your comment on
        inversion.  What I would tell you is that this transaction has a

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 12 of 34

12

significant, both strategic and financial, rationale. Tax is clearly a
benefit, but it's not the primary rationale for this.

We have studied this transaction very, very carefully. We believe
it is highly executable.

(Exhibit 5 to this Complaint at 5.)

38.    Shortly after Mr. Gonzalez said that tax inversion was not AbbVie's primary

rationale and that AbbVie considered the transaction "highly executable" despite the controversy

surrounding inversions, Credit Suisse analyst Vamil Divan asked a follow-up question about

whether an outright prohibition on tax inversions could cause the deal to fail:

> [A] follow-up to Chris [Schott]'s [question] around the discussions
> in Washington around inversions.
>
> There is obviously the breakup fee you guys mentioned around this
> deal. I'm just trying to understand kind of how important the ex-
> US domiciling for tax purposes is to this deal and if something
> were to come up where retroactively you are not able to actually
> change your domicile outside the US, is that something where the
> breakup fee would not restrict you from then going ahead and
> breaking up this deal and not going forward?

(*Id.*) In response, Mr. Gonzalez explained that AbbVie considered the strategic and financial

rationale for the acquisition "compelling" beyond tax considerations:

> As I mentioned in my comments a moment ago, this is a
> transaction that we believe has excellent strategic fit and has
> compelling financial impact well beyond the tax impact. We
> would not be doing it if it was just for the tax impact.
>
> That is an additional benefit that we have. We have looked
> carefully at that aspect of it and we believe it is executable at a
> high level.

(*Id.* at 5-6.)

39.    A full transcript of the call was made available three days later on the Securities

and Exchange Commission's EDGAR website. (Exhibit 5.) Mr. Gonzalez's statements were

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 13 of 34

13

widely reported in the news media. (*See, e.g.*, Exhibit 6 to this Complaint, Paul Sandle, "AbbVie CEO says tax is not primary reason for buying Shire," *Reuters*, July 18, 2014.)

40. In its preliminary S-4 filing on August 21, 2014, a public filing AbbVie made available to all investors (Exhibit 7 to this Complaint), AbbVie stated that "[t]he AbbVie Board considered many factors in evaluating the [c]ombination and in determining to recommend the adoption of the [Shire transaction]" and "did not attribute any particular weight to any factors considered by it and did not form an opinion as to whether any individual factor (positive or negative), considered in isolation, supported or failed to support its recommendation." (*Id.* at 52-53.) AbbVie stated that, among other benefits, the Shire transaction was "likely to result in significant strategic and financial benefits to AbbVie and AbbVie Stockholders." (*Id.* at 53.)

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 14 of 34

### AbbVie's Misrepresentations and Concealment

41. As its subsequent actions revealed, AbbVie's statements that the Shire transaction was strategically and financially compelling beyond the tax impact, and that it had studied the transaction "very, very carefully" and had concluded it was "highly executable" despite the risk of government action against inversions, were, on information and belief, false and misleading. AbbVie concealed a material fact concerning its Board's support for the Shire transaction in its announcement and discussions of the deal with the investor community, on information and belief: that prior to the announcement of the agreement to acquire Shire, the AbbVie Board had not conducted an evaluation as to whether it would close the Shire transaction in the event the government took action that eliminated or reduced the tax-inversion benefits of the deal. On information and belief, AbbVie knew that Shire investors (such as Plaintiffs) would be highly reluctant to support the transaction if they knew that AbbVie had not conducted an evaluation as to whether it would close the transaction in the event the government took such action –

especially in light of the controversy surrounding tax inversions and the wide expectation that the

government might take such action. It was critical for investors to know that AbbVie had not

conducted an evaluation as to whether or not it would close the Shire acquisition if there were a

change in tax regulations because there was wide expectation at the time the deal was announced

that the government might take such action. On information and belief, instead of forthrightly

acknowledging that AbbVie had not conducted an evaluation as to whether a change in tax-

inversion regulations could lead it to withdraw from the Shire transaction, AbbVie, in response

to direct questions about the risk of governmental restrictions on inversions, assured investors

that tax benefits were "not the primary rationale" for the Shire deal, and represented that it had

"studied this transaction very, very carefully" and had concluded that the deal was "highly

executable" despite the potential for government action. On information and belief, AbbVie

understood that its misrepresentations and concealment would induce investors to acquire

interests and hold substantial positions in Shire shares in support of AbbVie's acquisition plan.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 15 of 34

42.     AbbVie did not disclose that it had not conducted an evaluation as to whether it

would close the Shire transaction in the event the government took action that eliminated or

reduced the tax-inversion benefits of the deal. Instead, AbbVie stated that it had carefully

studied tax-inversion risks, considered the relative importance of tax-inversion benefits, and

concluded that the Shire transaction was strategically and financially compelling beyond such tax

benefits. For example, mention of any tax matters in AbbVie's June 25, 2014 press release was

limited to less than 200 words out of more than 3,000, none of which stated or implied that the

Shire transaction depended on the absence of government action to reduce tax-inversion benefits.

AbbVie's presentation slides describing the Shire acquisition, which it also disclosed to investors

on the same day, did not mention tax benefits until the 20th slide of the 40-slide presentation,

and then did so only briefly. All of AbbVie's communications that day concerning its announced proposal to acquire Shire instead stated that it was pursuing Shire based on other financial and strategic benefits. Mr. Gonzalez's statements on behalf of AbbVie on July 18, 2014, as set forth above, underscored the secondary role of tax benefits to the strategic and financial benefits and showed that AbbVie's commitment to closing the Shire transaction was not contingent on the absence of government restrictions on tax inversions. Likewise, AbbVie's agreement to pay a $1.635 billion break fee, while expressly carving out the availability of tax-inversion benefits as a condition of the deal, further indicated that the AbbVie Board had committed to the deal only after weighing the impact of potential government action against tax inversions.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 16 of 34

43.    Six days after Mr. Gonzalez's statements, on July 24, 2014, President Obama again spoke out against inversions and called companies that had re-incorporated overseas "corporate deserters." (Exhibit 8 to this Complaint, Lynn Sweet, "Obama blasts 'corporate deserters,'" *Chicago Sun-Times*, July 25, 2014, p. 6.) On the day after President Obama's statement, AbbVie issued a press release reiterating that the Shire acquisition was "strategically compelling for both companies and will create a larger and more diversified biopharmaceutical company with multiple leading franchises. The new company will also have significant financial capacity for future acquisitions, investment and enhanced shareholder distributions and value creation." (Exhibit 9 to this Complaint at 2.) AbbVie's press release did not mention tax-inversion considerations or suggest that government action on tax inversions could prevent the closing of the deal.

44.    Two weeks later, on August 5, 2014, the Obama administration announced that in addition to pressing for legislation restricting tax inversions, the U.S. Department of the Treasury

had begun "reviewing a broad range of authorities for possible administrative actions that could

limit the ability of companies to engage in inversions, as well as approaches that could

meaningfully reduce the tax benefits after inversions take place." Two days after that, AbbVie

again reassured investors that it was committed to closing the Shire deal. On August 7, 2014,

AbbVie CFO Mr. Chase, who had been on the July 18, 2014 investor conference call with Mr.

Gonzalez, spoke with analysts about the Shire acquisition. Credit Suisse analyst Vamil Divan,

who had asked Mr. Gonzalez about the significance of inversion considerations on the July 18

investor conference call, and two other Credit Suisse analysts authored a widely-circulated report

of the discussion with Mr. Chase. (Exhibit 10 to this Complaint.) As set forth in that August 7

report, titled "AbbVie Inc. – Discussion with CFO Provides Reassurance," Mr. Chase stated that

AbbVie had a "compelling" rationale for acquiring Shire beyond tax-inversion considerations,

and that AbbVie remained committed to the Shire deal despite potential government action

against inversions:

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 17 of 34

> **ABBV remains committed to the Shire deal.** Despite potential
> changes to the US tax code that may make inversions less
> attractive, ABBV's CFO reiterated their view that the Shire deal is
> compelling even beyond the benefits of an inversion.
>
> \* \* \*
>
> **Deal close still expected in 4Q.** ABBV remains confident that
> this is a highly-executable transaction and they continue to expect
> the deal to close by year-end.

(*Id.* at 1-2 (emphasis in original).)

45. On August 21, 2014, AbbVie filed with the SEC its preliminary S-4 for the Shire

acquisition. (Exhibit 7.) AbbVie's S-4 discussed the anticipated strategic and financial benefits

of the deal that AbbVie had disclosed in its prior press releases and investor conference

materials. In the "Risk Factors" section, AbbVie referred to various proposals that had been

17

introduced to change U.S. or international tax laws and regulations, and explained that the proposals, if enacted, could negatively impact the tax benefits of the acquisition. (*Id.* at 28-32.) AbbVie also stated that in late July, after AbbVie and Shire had announced the proposed acquisition, anti-tax-inversion legislation had been proposed, and the U.S. Department of the Treasury had been urged to promulgate regulations or other guidance that could adversely impact the effective tax rate of a combined AbbVie-Shire company. (*Id.* at 31-32.)

46.     Importantly, while AbbVie stated in its preliminary S-4 that changes in the U.S. tax laws could adversely impact the tax benefits of the AbbVie-Shire combination (*id.* at 54), AbbVie did not disclose that it might not close the Shire transaction in the event the government took action that eliminated or reduced the tax-inversion benefits of the deal.

47.     On September 5, 2014, AbbVie published a message from Mr. Gonzalez to AbbVie employees, providing an update on the Shire acquisition. In this message, Mr. Gonzalez reported on the ongoing work of the AbbVie and Shire teams to prepare for the "smooth integration" of the two companies:

> Today I want to let you know that the AbbVie Transition Office (ATO) has been hard at work with a dedicated Shire transition team so that we will be ready to integrate once our two great companies become one. They have participated in cross-company meetings and are making plans for a smooth integration.

(Exhibit 11 to this Complaint.)

48.     AbbVie also disseminated a follow-up September 5 message, from AbbVie Vice President of Enterprise Strategies Chris Turek, the executive leading AbbVie's global effort to integrate Shire's business into AbbVie, to AbbVie employees. Mr. Turek reported that integration teams would "launch" later that month in order to close the merger before year end:

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 18 of 34

> In follow-up to Rick's message earlier today, I would like to provide you with a few key updates from the AbbVie Transition Office (ATO) related to integration planning.
>
> The ATO is working closely with a dedicated Shire transition team for a structured and coordinated approach. We have had several initial meetings to ensure alignment. Later this month we will meet to launch our joint integration planning teams as we aim for a fourth-quarter close.

(Exhibit 12 to this Complaint.)

49.     Shortly after these AbbVie statements about the planned integration of Shire, the government took limited action against tax inversions. On September 22, 2014, the U.S. Department of the Treasury issued changes to inversion-related tax regulations that would partially reduce AbbVie's tax benefit from the Shire acquisition. (Exhibit 13 to this Complaint.) Compared to many of the earlier proposals for government action, the new regulations were relatively modest. Consistent with AbbVie's statements and assurances concerning the compelling strategic rationale for the AbbVie-Shire combination beyond tax benefits, Shire shares moved in line with the overall market, essentially unaffected by the announcement. This reflected the market's assessment that this government action would not cause AbbVie to back out of the Shire transaction.

50.     In the wake of the new Treasury regulations, and consistent with AbbVie's prior statements and actions, AbbVie gave no indication that its Board was considering abandoning the Shire acquisition in light of the government action. Instead, a full week later, on September 29, 2014, Mr. Gonzalez issued a letter to Shire's employees, which AbbVie publicized to investors and filed with the SEC. Mr. Gonzalez's letter did not suggest that the recent government action would prevent the closing of the Shire acquisition. To the contrary, Mr. Gonzalez reported further on the integration efforts he had discussed in his September 5 message

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 19 of 34

19

to AbbVie employees. Mr. Gonzalez now said: "I'm more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire…. I'm happy to say I'm more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you." (Exhibit 14 to this Complaint.)

51.     On that same day, September 29, AbbVie also published a letter to AbbVie employees from Mr. Turek, the AbbVie executive directing the Shire integration, reporting on merger integration planning meetings between Shire and AbbVie employees that had taken place *after* the Treasury Department's announcement of new tax-inversion restrictions. Mr. Turek's letter addressed AbbVie's objectives in integrating Shire, and repeated his early September message that AbbVie "aim[ed] for a fourth-quarter close" of the Shire acquisition. (Exhibit 15 to this Complaint.)

52.     On information and belief, Mr. Gonzalez had financial and other incentives to maintain investor support for the deal after the September 22 regulation announcement. Mr. Gonzalez had led, had been personally involved in, and staked his own credibility on the successful conclusion of AbbVie's effort to acquire Shire. The Board's decision to close the acquisition – which would substantially increase AbbVie's market value, product lines, and global reach – would provide a basis for an increase in Mr. Gonzalez's compensation, on information and belief. Mr. Gonzalez's and Mr. Turek's September 29 statements were widely reported to confirm that the recent government action to reduce tax-inversion benefits would not prevent the closing of the Shire acquisition because the strategic and other financial benefits of the deal remained. For example, on September 30, 2014, *The Wall Street Journal* published an article, "AbbVie CEO Tells Employees That Shire Deal is Going Through," which reported:

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 20 of 34

> Seeking to dissuade any doubters, AbbVie chief executive Richard
> Gonzalez started the week by sending a memo to Shire employees
> to say that plans are proceeding apace to acquire Shire. At the
> same time, Chris Turek, a vp of enterprise strategies at AbbVie,
> sent a memo to AbbVie employees in which he talked up "similar
> cultures" and predicted the $54 billion deal would close in the
> fourth quarter.
>
> Not surprisingly, both memos were also filed with the U.S.
> Securities and Exchange Commission as a way to reassure
> investors that the deal was still being pursued.

(Exhibit 16 to this Complaint.)

### The AbbVie Board's Abandonment of the Shire Acquisition

53. On October 14, 2014, only 15 days after (1) Mr. Gonzalez's declarations that he was "more energized than ever" and "more confident than ever" about the AbbVie-Shire combination, and (2) AbbVie's simultaneous disclosure of its Shire merger-integration efforts and its reiterated intention to close the transaction in the fourth quarter, AbbVie announced that it had notified Shire of the AbbVie Board's intention to reconsider its July 18, 2014 recommendation that AbbVie stockholders adopt the AbbVie-Shire merger agreement. (Exhibit 17 to this Complaint.) AbbVie announced that its Board would consider the impact of the U.S. Department of the Treasury's changes to the tax regulations issued on September 22, 2014. (*Id.*) The announcement surprised the market in light of AbbVie's previous statements regarding the compelling strategic and financial benefits of the deal and AbbVie's statements that it already had carefully studied the tax implications of the deal in light of possible changes to tax regulations. Shire shares closed down more than 20% after the surprise announcement.

54. After this announcement, the Credit Suisse investment analyst Mr. Divan, who had heard Mr. Gonzalez and Mr. Chase describe AbbVie's compelling strategic rationale for acquiring Shire on the July 18, 2014 investor conference call, sent a report to clients stating that "AbbVie's management's credibility may now be called into question given the non-inversion

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 21 of 34

21

benefits they touted when initially selling the deal and the fact that their limited public comments since the Treasury Notice was released have stressed the merits of getting the deal done." (Exhibit 18 to this Complaint at 2, Credit Suisse analyst Vamil Divan, quoted by Oliver Staley and Cynthia Koons, "AbbVie's Threat on Shire Deal Is Latest Tax Rule Fallout," *Bloomberg Business*, October 14, 2014.)

55. On October 15, 2014, AbbVie issued a press release announcing that its Board had withdrawn its July recommendation to AbbVie stockholders in favor of the proposed transaction with Shire. (Exhibit 19 to this Complaint.) AbbVie said that its Board made this determination following its consideration of the impact of the U.S. Department of the Treasury's changes to the tax regulations issued on September 22, 2014. (*Id.*) AbbVie attributed its decision to abandon the acquisition solely to reductions in the tax-inversion benefit as a result of the Treasury Department's announced changes. AbbVie said that it was abandoning the deal despite the fact that "the strategic rationale of combining our two companies remains strong." (*Id.*)

56. Shire shares fell even further after the announcement, below its price immediately before AbbVie's June 20, 2014 announcement of the Shire negotiations.

57. The AbbVie Board's withdrawal of support for the transaction, which ensured that AbbVie's stockholders would not support the deal, triggered AbbVie's obligation to pay the $1.635 billion break fee to Shire. AbbVie had also incurred hundreds of millions of dollars in additional costs related to the merger. Shire CEO Flemming Ornskov, who was preparing for a Chicago-area meeting on Shire's integration with AbbVie when he learned on October 14th that AbbVie's Board was reconsidering support for the acquisition, said of the Board's decision: "We were as dumbfounded as anyone else was who observed it from the outside." (Exhibit 20 to this

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 22 of 34

Complaint.) AbbVie's decision to abandon the Shire acquisition under these circumstances prompted a Fortune columnist to ask rhetorically, "what conclusion other than outright deceit can we draw…[?]" (Exhibit 21 to this Complaint.)

### Plaintiffs' Justifiable Reliance on, and the Materiality of, AbbVie's Misrepresentations and Concealment

58.      Plaintiffs are hedge funds that invest funds allocated by their investors in an investment strategy known as merger arbitrage. In a typical merger, an acquirer like AbbVie offers to purchase a target company like Shire at a share price significantly above the current market price of the target's shares. The premium over the current share price provides an incentive to the target's shareholders to agree to the acquisition, and typically leads to a significant immediate increase in the target's share price after announcement of the proposed merger. But before the closing date, the target's shares typically trade at a discount to the acquirer's announced offer price.

59.      On June 20, 2014, after AbbVie announced its first attempts to acquire Shire shares at a significant premium to their market price, Shire's share price increased from £37.38 to £43.71 per share, nearly 17%. On July 18, 2014, after AbbVie's announcement of an agreement to acquire Shire for £52.48 per share (in cash and AbbVie stock), Shire's share price further increased nearly 4%, from £48.06 to £49.96, and was by then up more than 33% since the day before AbbVie's initial June 20, 2014 announcement of its attempts to negotiate a Shire purchase. Nevertheless, Shire's July 18 closing price of £49.96 reflected a discount from the agreed offer price of £52.48 (measured at that day's prices).

60.      The difference between the acquirer's offer price and the post-announcement (and pre-closing) trading price of the target is known as the arbitrage spread. If the acquisition closes, this difference is eliminated at closing when the acquirer pays the offer price. But if the

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 23 of 34

acquisition fails to close – for example, because an antitrust regulator blocks the merger – the target's price typically declines dramatically, reflecting the fact that the target will no longer be acquired at the announced premium to its pre-announcement trading price.

61.     Merger arbitrage investors seek to earn the arbitrage spread by buying and holding a position in the target stock until acquisition closing, based on careful monitoring of the closing probability, including by examining the statements of the acquirer and the target related to the merger.

62.     A critical consideration in merger arbitrage is the probability that the acquisition will close. If the acquisition closes, the merger arbitrage investor will capture the arbitrage spread between the target's price after announcement and the final closing price. But if the acquisition fails to close, the merger arbitrage investor will incur a loss when the target's price declines after the deal's failure becomes known in the market. The price at which merger arbitrage investors are willing to buy, and the size of the position they are willing to take, depend significantly on the probability that a merger will close.

63.     Merger arbitrage aids market functioning by providing liquidity to investors in potential targets who prefer to sell their holdings before closing so as to avoid any risk that the transaction will not close. Merger arbitrage is also an important mechanism for achieving stock-market efficiency in the pricing of target shares.

64.     In conducting merger arbitrage, investors like Plaintiffs carefully evaluate and monitor the probability that a proposed acquisition will close. Here, AbbVie's statements describing its rationale for acquiring Shire, the disclosed conditions to closing the transaction, and AbbVie's disclosed commitment to closing the transaction, including the June 25, 2014, July 18, 2014, and September 29, 2014 statements detailed above, were material to Plaintiffs.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 24 of 34

Likewise, whether, prior to announcing the deal, AbbVie's Board had conducted an evaluation as to whether it would close the Shire transaction in the event the government took action that eliminated or reduced the tax-inversion benefits of the deal was also material to Plaintiffs.

65.     Plaintiffs independently made merger arbitrage investments related to Shire. By July 17, 2014, the Elliott Plaintiffs had acquired interests in approximately 8.2 million Shire shares, with a value in excess of $600 million. By July 24, 2014, the Elliott Plaintiffs increased their positions to interests in approximately 12.7 million Shire shares, with a value in excess of $1 billion. By October 14, 2014, the Elliott Plaintiffs had further increased their Shire positions to interests in approximately 15.5 million Shire shares, with a value of nearly $1.3 billion.

66.     The Tyrus Plaintiffs initiated their Shire positions at issue on July 18, 2014, the day of AbbVie's announcement of the deal and Mr. Gonzalez's statements about AbbVie's rationale for the deal, and by October 14, 2014 had increased their Shire position to interests in approximately 6.7 million Shire shares, with a value of approximately $550 million.

**AbbVie's Intent to Induce a False Belief by Shire Investors**

67.     Prior to July 18, 2014, AbbVie had directed numerous communications to Shire shareholders designed to garner support for Shire's acquisition by AbbVie.

68.     When AbbVie publicly disclosed its increased offer price for Shire on July 8, 2014, AbbVie said that it had met with or spoken to "a large number of Shire shareholders, who collectively represent a majority of Shire's outstanding shares." (Exhibit 22 to this Complaint at 1.) Mr. Gonzalez stated: "AbbVie has made a compelling offer to Shire that creates immediate and long-term value to shareholders of both companies. We think its shareholders should strongly encourage the Shire board to engage in constructive dialogue with AbbVie." (*Id.* at 2.) The same day, AbbVie stated: "AbbVie strongly encourages [Shire] shareholders to consider the Fourth Proposal [*i.e.*, the revised proposal that AbbVie announced on July 8, 2014] and

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 25 of 34

25

communicate their perspective to Shire's Board…." (*Id.*) Mr. Gonzalez personally participated in several meetings with large Shire shareholders between June 20, 2014 and July 8, 2014.

69.     On information and belief, Mr. Gonzalez and AbbVie knew before AbbVie's July 18, 2014 announcement of the Shire deal that the Elliott Plaintiffs were large Shire shareholders acting in a merger arbitrage capacity. On or before June 25, 2014, Mr. Gonzalez and AbbVie knew that AbbVie's June 25, 2014 disclosures of its takeover proposals to Shire triggered a rule requiring any owner of an interest of 1% or more of Shire's shares to disclose its positions. AbbVie had given public notice to investors on June 25, 2014 of this duty to disclose positions in Shire shares. By the morning (Chicago time) of July 17, 2014, the Elliott Plaintiffs had disclosed aggregate holdings representing approximately 1.29% of Shire's shares (Exhibit 23 to this Complaint at 2), with a value that day in excess of $600 million.

70.     On information and belief, Mr. Gonzalez and AbbVie also knew the significant Shire holdings of other large merger arbitrageurs before AbbVie's July 18, 2014 deal announcement, including, for example, that Chicago-based hedge fund Pentwater had disclosed aggregate holdings representing approximately 1.35% of Shire's shares on July 17, 2014. (Exhibit 24 to this Complaint at 2.)

71.     On information and belief, Mr. Gonzalez and AbbVie understood that because merger arbitrage investors had a vested interest in the Shire deal closing in order to capture the arbitrage spread, such investors who held Shire shares would, consistent with their economic interest, almost certainly approve the acquisition of Shire by AbbVie or any higher bidder, something that was not necessarily true of other Shire shareholders. Merger arbitrage investing provided liquidity to selling Shire shareholders, and placed the Shire positions in the hands of investors who would be highly unlikely to derail the transaction, because doing so would be

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 26 of 34

against their rational economic interest. On information and belief, AbbVie therefore knew that it would attract merger arbitrage investors by making assurances that the deal was likely to close. AbbVie had an incentive to manage the expectations of merger arbitrageurs active in the Shire deal by making statements concerning the likelihood that the deal would close.

**Count I: Fraudulent Misrepresentation**
**(June 25, 2014 and July 18, 2014 Statements)**

72. Plaintiffs incorporate the allegations in paragraphs 1-71 as if set forth fully herein.

73. AbbVie's statements that "[t]he proposed combination is strategically compelling to AbbVie and Shire" (June 25, 2014), that the transaction had a "compelling financial impact well beyond the tax impact" (July 18, 2014), and that it had "studied this transaction very, very carefully" and had concluded that the deal was "highly executable" despite the potential for government action against tax inversions (July 18, 2014), were statements of material fact that, on information and belief, were known by AbbVie to be false and misleading.

74. By stating that the Shire transaction was strategically and financially compelling beyond the tax impact, and that AbbVie had studied the transaction "very, very carefully" and concluded it was "highly executable" despite the risk of government restrictions on tax inversions, AbbVie induced Shire investors to believe that AbbVie's support for the Shire transaction was not contingent on the absence of government restrictions on tax inversions because it had concluded that the deal was strategically and financially compelling beyond the tax impact. Plaintiffs justifiably relied on AbbVie's statements in deciding to hold their existing positions and to increase their interests in Shire shares.

75. AbbVie's statements on June 25, 2014 and July 18, 2014 were material to Plaintiffs because Plaintiffs would not have continued to hold their existing positions in Shire shares in support of the transaction, nor would Plaintiffs have acquired additional interests in

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 27 of 34

27

Shire shares in support of the transaction, if Plaintiffs knew that AbbVie's Board had not conducted an evaluation as to whether it would close the Shire transaction in the event that government action reduced the tax-inversion benefits of the deal.

76.    If AbbVie had been truthful, then the Plaintiffs would have unwound their existing positions and would not have acquired additional interests in Shire shares.

77.    As a result of Plaintiffs' reliance on AbbVie's misrepresentations, Plaintiffs were injured. By October 14, 2014, before AbbVie announced plans to reconsider its recommendation of the merger with Shire and the resultant termination of the deal, the Elliott Plaintiffs had acquired interests in Shire shares worth more than $1.28 billion, and the Tyrus Plaintiffs had acquired interests in Shire shares worth approximately $550 million. AbbVie's decision not to close the Shire acquisition caused the price of Shire shares to fall nearly 30%.

**WHEREFORE**, Plaintiffs request that this Court grant the following relief:

(1)    Award Plaintiffs compensatory damages in an amount to be determined at trial;

(2)    Award Plaintiffs punitive damages in an amount to be determined at trial;

(3)    Award Plaintiffs interest in an amount to be determined by the Court; and

(4)    Grant such other relief as this Court deems appropriate and just.

**Count II: Fraudulent Concealment**

78.    Plaintiffs incorporate the allegations in paragraphs 1-77 as if set forth fully herein.

79.    Based on AbbVie's statements at the time of the announcement of the deal about the Shire transaction, including its representation that it had "studied this transaction very, very carefully" and had concluded that the deal was "highly executable" despite the potential for government action that would eliminate or reduce tax-inversion benefits of the deal, AbbVie had

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 28 of 34

a duty to disclose that, on information and belief, it had not conducted an evaluation as to whether it would close the Shire transaction in the event government action eliminated or reduced the tax-inversion benefits of the deal. On information and belief, AbbVie concealed this fact. On information and belief, AbbVie knew that investors (such as Plaintiffs) would be highly reluctant to support the transaction if they knew that AbbVie had not studied whether it would close the transaction in the event the government took such action – especially in light of the controversy surrounding tax inversions and the wide expectation that the government might take such action.

80.     AbbVie's concealment was a device to mislead Plaintiffs and other investors by making it appear that AbbVie's commitment to closing the Shire transaction was not contingent upon the absence of government restrictions on tax inversions.

81.     The concealed facts were material to Plaintiffs, and Plaintiffs were misled by the concealment.

82.     Plaintiffs could not have discovered, through reasonable inquiry, inspection, or otherwise, that, on information and belief, the AbbVie Board had not conducted an evaluation as to whether it would close the Shire transaction in the event that government action eliminated or reduced the tax-inversion benefits of the deal.

83.     If AbbVie had been truthful that, on information and belief, it had not evaluated whether it would close the Shire transaction in the event that government action reduced the tax-inversion benefits of the deal, then the Elliott Plaintiffs and the Tyrus Plaintiffs would have unwound their existing positions and would not have acquired additional interests in Shire shares.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 29 of 34

29

84.     As a result of Plaintiffs' reliance on AbbVie's concealment, Plaintiffs were injured.  By October 14, 2014, before AbbVie announced plans to reconsider its agreement to acquire Shire and the resultant termination of the deal, the Elliott Plaintiffs had acquired interests in Shire shares worth more than $1.28 billion, and the Tyrus Plaintiffs had acquired interests in Shire shares worth approximately $550 million.  AbbVie's decision not to close the Shire acquisition caused the price of Shire shares to fall nearly 30% in just two days.

**WHEREFORE**, Plaintiffs request that this Court grant the following relief:

(1)     Award Plaintiffs compensatory damages in an amount to be determined at trial;

(2)     Award Plaintiffs punitive damages in an amount to be determined at trial;

(3)     Award Plaintiffs interest in an amount to be determined by the Court; and

(4)     Grant such other relief as this Court deems appropriate and just.

**Count III: Fraudulent Misrepresentation**
**(September 29, 2014 Statements)**

85.     Plaintiffs incorporate the allegations in paragraphs 1-84 as if set forth fully herein.

86.     Mr. Gonzalez's publicly disclosed statements on behalf of AbbVie on September 29, 2014, one week after the government announced new tax-inversion regulations – "I'm more energized than ever about our two companies coming together, especially because I can already see many shared traits and values in the people at AbbVie and Shire" and "I'm more confident than ever about the potential of our combined organizations now that I've had a chance to meet with many of you" – were fraudulent misrepresentations.  On information and belief, Mr. Gonzalez knew when he made those statements that the AbbVie Board was then evaluating whether to abandon and cause the termination of the combination his statements were describing, in light of the government announcement one week earlier.  As the CEO and leader of AbbVie's

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 30 of 34

effort to acquire Shire, Mr. Gonzalez had special knowledge of the probability that the merger would not close in light of the September 22, 2014 tax regulation changes. AbbVie abandoned the Shire transaction just two weeks after Mr. Gonzalez's statements. On information and belief, Mr. Gonzalez's statements lacked factual basis, and Mr. Gonzalez knew facts about AbbVie's internal reaction to the tax regulation changes that were incompatible with his statements. On information and belief, Mr. Gonzalez made the statements with reckless disregard for their truth or falsity, knowing that Shire investors such as Plaintiffs had no reason to distrust his statements.

87.     Mr. Gonzalez's statements on September 29, 2014 were material to Plaintiffs because Plaintiffs would not have continued to hold their existing positions in Shire shares, nor would Plaintiffs have acquired additional interests in Shire shares if Plaintiffs knew that AbbVie was then evaluating whether to abandon the Shire acquisition as a result of the recently announced restrictions on tax inversions. Plaintiffs relied on Mr. Gonzalez's September 29, 2014 statements in deciding to hold their existing positions and to increase their positions in Shire shares because the probability that the Shire acquisition would close appeared to be even higher based on Mr. Gonzalez's statements.

88.     On information and belief, Mr. Gonzalez made his September 29, 2014 statements with the intent to induce Plaintiffs and other similarly-situated Shire investors to continue supporting the Shire acquisition by purchasing and holding positions in Shire shares, despite the recent tax regulation changes.

89.     AbbVie had superior knowledge of its Board's evaluation as to whether to abandon the Shire acquisition following the tax-inversion regulation changes. Plaintiffs had no ability to determine these facts.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 31 of 34

31

90.    Between September 29 and October 14, 2014, before AbbVie announced its plans to reconsider its recommendation of the merger with Shire, which resulted in its termination of the deal, the Tyrus Plaintiffs acquired additional interests in approximately 3.39 million Shire shares and continued to hold their pre-existing positions in approximately 3.33 million Shire shares.  The Elliott Plaintiffs acquired additional interests in approximately 1.2 million Shire shares and continued to hold their pre-existing positions in approximately 14.3 million Shire shares.  When AbbVie decided not to close the Shire acquisition, the price of Shire shares immediately fell nearly 30%.  Mr. Gonzalez's false September 29, 2014 statements caused Plaintiffs to suffer substantial damages.

91.    As a result of Plaintiffs' reliance on AbbVie's misrepresentations, Plaintiffs were injured.  If AbbVie had been truthful, then the Plaintiffs would have unwound their existing positions and would not have acquired additional interests in Shire shares.

**WHEREFORE**, Plaintiffs request that this Court grant the following relief:

(1)    Award Plaintiffs compensatory damages in an amount to be determined at trial;

(2)    Award Plaintiffs punitive damages in an amount to be determined at trial;

(3)    Award Plaintiffs interest in an amount to be determined by the Court; and

(4)    Grant such other relief as this Court deems appropriate and just.

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 32 of 34

Dated: June 24, 2016

Respectfully submitted,

By: /s/ James B. Heaton, III

One of the Attorneys for Plaintiffs

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 33 of 34

Jeffrey A. Hall
James B. Heaton, III
Cindy L. Sobel
Robert B. Tannenbaum
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Tel. (312) 494-4400
Fax (312) 494-4440
jeffrey.hall@bartlit-beck.com
jb.heaton@bartlit-beck.com
cindy.sobel@bartlit-beck.com
robert.tannenbaum@bartlit-beck.com
Firm ID No.: 31210

*Counsel for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: June 24, 2016        By: /s/ James B. Heaton, III

One of the Attorneys for Plaintiffs

---

Jeffrey A. Hall
James B. Heaton, III
Cindy L. Sobel
Robert B. Tannenbaum
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Tel. (312) 494-4400
Fax (312) 494-4440
jeffrey.hall@bartlit-beck.com
jb.heaton@bartlit-beck.com
cindy.sobel@bartlit-beck.com
robert.tannenbaum@bartlit-beck.com
Firm ID No.: 31210

*Counsel for Plaintiffs*

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
PAGE 34 of 34

ELECTRONICALLY FILED
6/24/2016 10:40 AM
2016-L-006279
CALENDAR: N
PAGE 1 of 316
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| Elliott Associates, L.P.; Elliott International, L.P.; The Liverpool Partnership; Tyrus Capital Event Master Fund Limited; and Tyrus Capital Opportunities Master Fund Limited, | Case No.: |
| Plaintiffs, | Judge: |
| -v- | JURY TRIAL DEMANDED |
| AbbVie Inc., | |
| Defendant. | |

## COMPLAINT EXHIBIT INDEX

Exhibit 1 ................................Press Release, AbbVie, Response to Press Speculation (June 20, 2014)

Exhibit 2 ................................Press Release, AbbVie, Statement from AbbVie Inc. regarding a possible offer for Shire, plc (June 25, 2014)

Exhibit 3 ................................Presentation, AbbVie, AbbVie's proposed combination with Shire (June 25, 2014)

Exhibit 4 ................................Letter from Richard A. Gonzalez, AbbVie Chairman and CEO, to AbbVie employees (June 25, 2014)

Exhibit 5 ................................AbbVie Conference Call Transcript (July 18, 2014)

Exhibit 6 ................................Paul Sandle, "AbbVie CEO says tax is not primary reason for buying Shire," *Reuters*, July 18, 2014

Exhibit 7 ................................AbbVie, Registration Statement under the Securities Act of 1933 (Form S-4) (Aug. 21, 2014)

Exhibit 8 ................................Lynn Sweet, "Obama blasts 'corporate deserters,'" *Chicago Sun-Times*, July 25, 2014

Exhibit 9 ................................Press Release, AbbVie, AbbVie Reports Second-Quarter 2014 Financial Results (July 25, 2014)